PAT DEEN, in her capacity as       :        CIVIL ACTION
Conservator for KENNETH DEEN,
an incapacitated adult, and        :
LINDA DEEN, individually,

    Plaintiffs,                    :

                                       :

v.

                                       :

SHANNON EGLESTON, D.M.D.,

                                       :

    Defendant.                         NO. CV208-037

## O R D E R

Plaintiffs, Pat Deen, in her capacity as Conservator for Kenneth Deen, an incapacitated adult, and Linda Deen, individually, filed the above-captioned case against Dr. Shannon Egleston, D.M.D., alleging claims for (1) medical malpractice, (2) negligence per se, (3) simple negligence, (4) constructive fraud, and (5) loss of consortium.

Presently before the Court is Egleston's motion for summary judgment. Because the evidence is insufficient to support any claim against Egleston for constructive fraud, and because the claims asserted for simple negligence and negligence per se are actually claims for medical malpractice, the motion will be **GRANTED** in part. Because Georgia Code section 9-3-73 is unconstitutional as applied

to Kenneth Deen, the motion will be **DENIED** in part.

## BACKGROUND

Viewing the facts in the light most favorable to the Deens, as the Court must on a summary judgment motion, the facts are as follows. This action was instituted by Linda Deen, as next friend of her husband, Kenneth Deen. Linda Deen was later appointed as her husband's conservator. On December 1, 2008, by order of the Glynn County Probate Court, Kenneth Deen's mother, Patricia Deen, was appointed as her son's successor conservator. Dkt. No. 60, Ex. A.

On July 18, 2005, Mr. Deen sought treatment at the dental office of Dr. Tami Kidney, D.D.S., doing business as "Gentle Dental," in Brunswick, Georgia. At the office, Dr. Shannon Egleston evaluated Mr. Deen, who complained of a toothache. Previously, Deen had a root canal on tooth nine, and, in July 2005, the surgical site had become infected. Deen's gums had swollen near the tooth and pus was draining into his mouth.

Egleston believed that the tooth could be saved, and recommended that Deen have a new bridge to address the problem after taking care of the infection. Egleston

AO 72A
(Rev. 8/82)

referred Deen to Dr. Randolph Stevens, an endodontist on St. Simons Island, Georgia, to get his opinion regarding treatment of tooth number nine. Egleston made the referral appointment for Deen for the next day, July 19, 2005.

Deen saw Dr. Stevens, and Stevens has testified that he called Gentle Dental after his consultation with Deen. Stevens noted Deen's dental problems and has stated that he advised Dr. Kidney's office of his proposed treatment plan. Stevens noted that Deen had an infection in and around tooth number nine. Dkt. No. 72, Ex. 4, Stevens Dep. 37 & 39. The results of this consultation were not recorded in Deen's patient records at Gentle Dental.

On August 4, 2005, Deen was treated at the offices of Gentle Dental, where Trina Dorsey, a dental hygienist, performed a full mouth debridement. A full mouth debridement is a cleaning where there is excessive tartar buildup on the teeth. According to Dorsey, such a procedure is (mostly) above the gum line,[1] on the surface of the teeth, and does not require the use of anesthesia. The procedure is more invasive and time consuming than a regular cleaning, and is

---

[1] Dorsey testified that she sometimes cleans below the gum line when performing a debridement, depending on the patient's sensitivity to pain. Dkt. No. 72, Ex. 6, Dorsey Dep. 29.

AO 72A
(Rev. 8/82)

usually necessitated in cases where the patient has not been to the dentist recently. Dkt. No. 72, Ex. 6, Dorsey Dep. 38-40 & 51; Dkt. No. 72, Ex. 7, Kidney Dep. 12-13.

Subsequently, Deen began to exhibit troubling symptoms. After August 14, 2005, Deen experienced painful headaches and he and his wife called his back surgeon, Dr. John Shutack. On August 18, 2005, around 11:00 p.m., Deen went to the hospital in Brunswick. Deen was experiencing significant swelling of the brain, and one of his eyes bulged out of its socket. Deen did not have a CT scan at that time, but he incorrectly told the doctor on duty that he had a CT scan previously. Deen was released around two in the morning on the following day, August 19, 2005.

Later that day, Deen had a CT scan of his brain and sinus at the hospital in Brunswick, which revealed that Deen had suffered a hematoma, edema, and brain hemorrhaging. Deen's complaints were not recognized as being related to his tooth infection. Deen went home after the CT scan and awaited results from the test.

Linda Deen found her husband later that day, unresponsive at their home, and called the ambulance to transport him back to the hospital, where he was admitted. Another CT scan followed, which revealed increased edema,

4

possible encephalitis, and a subdural empyema, which is a life-threatening brain infection. Due to the subdural empyema, Deen was disabled and rendered incompetent to handle his own affairs. Deen remained hospitalized until December 8, 2005. After release from the hospital, Deen has resided in nursing homes in and around Brunswick.[2]

Before the Deens filed the complaint, Egleston moved to Florida, and the Deens brought this action under the Court's diversity jurisdiction. The Court notes that Plaintiff's first amended complaint contains a curious statement relating to the amount in controversy. The complaint reports that Deen sustained injuries "in excess of" $10,000. Dkt. No. 47, ¶ 56.

The amount in controversy requirement for diversity cases was raised from $10,000 to $50,000 in 1989, and was increased again in 1996 to the current statutory amount of $75,000. 14B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3701 (3d ed. 1998). "[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith." St. Paul Mercury

---

[2] Egleston has submitted evidence suggesting that Kenneth Deen experienced a significant recovery in late November 2008, and is now able to reside with his parents, in a handicap-accessible home. Dkt. No. 67, Ex. 2.

5

<u>Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 288 (1938).

Dismissal for pleading an inadequate amount in controversy for diversity jurisdiction under 28 U.S.C. 1332 is inappropriate unless it appears to the Court to a legal certainty that the plaintiff's claim is actually for less than the statutory amount. <u>Id.</u> at 289. Plaintiffs have asserted a claim for more than $10,000; the sum they seek is not necessarily less than $75,000. Based on the evidence related to Plaintiff's incapacity and medical bills since August 19, 2005, it appears that substantially more than $75,000 is at stake in this litigation. Therefore, the Court has subject matter jurisdiction, and the case is not due to be dismissed based on the pleading relating to the amount in controversy.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

6

322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor[,]" United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

## DISCUSSION

### I. Motion to Strike

Egleston objects to the Deens' use of deposition testimony, taken in other medical malpractice cases against other providers involved in Kenneth Deen's care, which are or were pending before the Georgia state courts. Egleston was not present at said depositions, and could not cross-examine the witnesses, but Federal Rule of Civil Procedure 32 does not preclude the Court's consideration of this evidence on summary judgment. As Plaintiffs explain, they are relying on these depositions as "affidavits" at this stage of the proceedings.

7

Affidavits are admissible at the summary judgment stage, even though the affiants are not subject to impeachment. As with affidavits, the deponents were under oath and testified about matters on which they had personal knowledge. As such, the depositions may be considered. RSBI Aerospace v. Affiliated FM Ins. Co., 49 F.3d 399, 403 (8th Cir. 1995); Hoover v. Switlik Parachute Co., 663 F.2d 964, 966-67 (9th Cir. 1981); see also Tingey v. Radionics, 193 Fed. App'x 747, 765-66 (10th Cir. 2006); Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1415 n.12 (5th Cir. 1993); Langston v. Johnson, 478 F.2d 915, 918 (D.C. Cir. 1973); Askew v. Bloemker, 548 F.2d 673, 679 (7th Cir. 1976); Beiswenger Enters. Corp. v. Carletta, 46 F. Supp.2d 1297, 1299 (M.D. Fla. 1999).

The Southern District of Georgia case relied on by Defendant, Sires v. Luke, 544 F. Supp. 1155 (1982), is not to the contrary. In Sires, Judge Dudley H. Bowen, Jr., recognized that affidavits were admissible on summary judgment, and paraphrased the familiar rule that statements must be based on personal knowledge to be considered as evidence. Id. at 1158 & 1160.

> The material that is submitted in support of a
> summary judgment motion is not necessarily itself
> admissible at trial, but must set forth evidence
> that would be admissible if presented in
> appropriate form at trial. In other words, "the

8

evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content."

*Sphere Drake Ins., Ltd. v. All Am. Life Ins. Co.*, 300 F. Supp. 2d 606, 614 (N.D. Ill. 2003)(quoting *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)).

The Court will consider the depositions from related cases, which are relied on by both parties in support of, or in opposition to, Defendant's motion for summary judgment.

## II. Negligence **Per Se** and Simple Negligence Claims

The Deens aver that Egleston committed negligence per se or simple negligence by failing to supervise Trina Dorsey directly, the dental hygienist who performed the full mouth debridement on August 4, 2005. The Deens maintain that Egleston was negligent in failing to evaluate Mr. Deen on that date.

Georgia law provides:

Dental hygienists shall perform their duties only under the direct supervision of a licensed dentist. No dental hygienist shall diagnose, prescribe, determine the initial dosage, or increase the initial dosage of nitrous oxide, practice dentistry or do any kind of dental work other than to remove calcareous deposits, secretions, and stains from the surfaces of the

9

> teeth, to apply ordinary wash or washes of a
> soothing character, and to perform those acts,
> services, procedures, and practices which the
> board shall prescribe by rule or regulation.

Ga. Code Ann. § 43-11-74(a).

"Dental assistants shall perform their duties only under the direct, personal supervision of a licensed dentist. No dental assistant shall practice dentistry, dental hygiene, or do any kind of dental work other than those acts, services, procedures, and practices prescribed by rule or regulation of the board." Ga. Code Ann. § 43-11-81.

The Georgia Board of Dentistry Rules explain the "direct supervision" requirement set out in Georgia Code section 43-11-74(a):

> Direct supervision as it pertains to procedures
> delegated to a dental hygienist shall mean that
> a dentist licensed in Georgia is in the dental
> office or treatment facility, personally
> diagnoses the condition to be treated, personally
> authorizes the procedures and remains in the
> dental office or treatment facility while the
> procedures are being performed by the dental
> hygienist and, before dismissal of the patient,
> examines the patient.

Georgia Board of Dentistry Rule 150-5-.03(2).

These state law requirements explain that both dental hygienists and dental assistants are personnel that assist dentists. In contrast to a dental assistant, a dental hygienist must have an associate's degree in dental hygiene,

10

and must be licensed by the state.  Dkt. No. 72, Ex. 6,
Dorsey Dep. 7-9.  As the state statutes indicate, dental
hygienists have more independence than dental assistants,
commensurate with their training.  While dental assistants
may only perform services under the personal supervision of
a supervising dentist, dental hygienists clean teeth while
dentists are not present.  Id. at 17-20.  In the office where
Mr. Deen received treatment, Dr. Kidney also employed a
dental hygiene assistant, LeeAnn Jones, who assisted the
dental hygienist.  Id. at 18-19.

The uncontradicted evidence in this case shows that
Egleston developed the treatment plan for Kenneth Deen when
she examined him on July 18, 2005.  At that time, Egleston
diagnosed Deen with a periapical "abscess at tooth number
nine, and recommended that he see an endodontist to have it
treated.  Egleston also recommended that Deen have his teeth
cleaned.  A gross, or full mouth, debridement is a type of
teeth cleaning for persons who have a heavier buildup of
calcareous deposits and tartar.  Dkt. No. 72, Ex. 3, Egleston
Dep. 5-11.  Consequently, when Deen scheduled his teeth
cleaning on August 4, 2005, Dorsey performed the debridement.
Egleston testified that she did not believe it was necessary
for her to assess the condition of Deen's infection to

11

determine if the full mouth debridement was medically appropriate before Dorsey performed the debridement. Id. at 11-13.

As the Deens note, not all cases arising from the physician-patient relationship are medical malpractice cases. "[N]ot every suit which calls into question the conduct of one who happens to be a medical professional is a 'medical malpractice' action." Candler Gen. Hosp., Inc. v. McNorrill, 182 Ga. App. 107, 110 (1987). "Medical malpractice exists only where the act or omission by the professional requires the exercise of expert medical judgment." Jones v. Bates, 261 Ga. 240, 242 (1992).

"Where the care or service that allegedly resulted in the plaintiff's injury is 'by [its] very nature' medical care or a medical service involving medical knowledge and judgment, the claim is one for malpractice." Canas v. Al-Jabi, 282 Ga. App. 764, 787 (2006), rev'd on other grounds, Kaminer v. Canas, 282 Ga. 830 (2007). "On the other hand, '[a]dministrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence.'" Id. at 788 (quoting MCG Health, Inc. v. Casey, 269 Ga. App. 125, 128 (2004)). "[F]ailure to properly assess the degree of support required by a patient" is a "medical question,"

12

and any resulting claim arising out of such facts is one for medical malpractice.  <u>Id.</u>

The Deens submit that Egleston's failure to supervise the dental hygienist does not require expert testimony. Instead, Plaintiffs contend, the statutory and regulatory framework provide the standard by which to judge Egleston's omissions. The Court disagrees that the facts here present questions of simple negligence as to any claims against Egleston. The parties hotly contest whether Egleston was negligent in failing to examine Deen before the debridement took place on August 4, 2005. That alleged "failure to supervise" can only be resolved by expert testimony. Dkt. No. 72, Ex. 3, Egleston Dep. 8-20; Dkt. No. 1, Baxter Aff. ¶ 4(3). Accordingly, this is not a straightforward negligence <u>per se</u> case.

Unlike the cases relied on by Plaintiffs, this is not a simple battery cause of action. There is no evidence that Dr. Egleston failed to note some patient request, treatment, recommendation, or diagnosis in the record. <u>Upson County Hosp., Inc. v. Head</u>, 246 Ga. App. 386, 392-93 (2000). Nor is this a case where Egleston failed to read or follow directions that came with a medical product or device. <u>Sood v. Smeigh</u>, 259 Ga. App. 490, 495 (2003).

13

Rather, the Deens' averments of negligence relate to the proper standard of care by a practicing dentist. The Deens contend that Egleston breached two duties required of dentists -- first, to examine patients before they receive treatment and/or before they leave the office, and second, to recognize a condition requiring further treatment. These duties cannot be fairly characterized as administrative, clerical, or routine. Both duties require specialized medical knowledge.

The Deens contend that Egleston committed simple negligence in another particular. Plaintiffs submit that Defendant had a duty to ensure that office personnel working under her direction "properly documented patient charts with information related to the patient's care, condition and proposed course of treatment." Dkt. No. 47, ¶ 41.

There is some evidence in this case that Dr. Stevens called Gentle Dental to report his findings and recommendations, but this information never made it onto Deen's patient chart. Significantly, there is no evidence that Stevens talked to Egleston at this time. Further, it would be inappropriate to impose respondeat superior liability on Defendant when it is undisputed that everyone at Gentle Dental, including Egleston herself, and the

14

receptionist and the front office employees who answered the
phone, worked for Dr. Kidney. Dkt. No. 57-2, ¶ 1; Dkt. No.
73 at 1; Dkt. No. 72, Ex. 7, Kidney Dep. 23-24 & 29.

Under Georgia law, a doctor is not vicariously liable
for the acts of nurses or other assistants when she has no
control over the assistant's conduct. <u>Kaplan v. Gibson</u>, 192
Ga. App. 466, 468-69 (1989); <u>Gray v. John R. Vaughn, M.D.,
P.C.</u>, 217 Ga. App. 872, 874-75 (1995). There is no evidence
that Egleston had any authority over the conduct of these
personnel. Accordingly, there is no basis for holding
Egleston responsible for a co-worker's alleged failure to
note Stevens' call and recommendation.

In sum, the negligence claims asserted by the Deens
against Egleston are medical malpractice claims, requiring
expert testimony.


**III. Constructive Fraud Claim**

To support a claim for constructive fraud, a plaintiff
must show intentional concealment or misrepresentation by the
defendant. It cannot be presumed that the results of
treatment (or lack thereof) were misrepresented or withheld
fraudulently, "rather than negligently or possibly without

15

fault." Kane v. Shoup, 260 Ga. App. 723, 726 (2003).

The Deens insist that Dr. Kidney, and her employees, owed Kenneth Deen a fiduciary duty. Plaintiffs urge that Defendant owed an "affirmative duty to inform patients that Georgia law requires that they be personally evaluated and diagnosed by a dentist when a dental hygienist performs procedures such as a full mouth debridement, and, further to in fact perform dental hygiene procedures only when a dentist[] has examined the patient." Dkt. No. 47, ¶ 46. Had Mr. Deen been advised of this duty, the Deens contend, "he would have sought evaluation by a dentist, leading to the proper diagnosis and treatment." Id. ¶ 49. Plaintiffs claim that the failure to make this disclosure prevented him from learning of the breach of the fiduciary duty, which tolls the statute of limitations.

It is true that Georgia Board of Dentistry Rule 150-5-.03(2) requires that the dentist examine the patient before he is dismissed. Still, there is no evidence that Egleston was advised that the debridement had been completed and refused to examine Deen. If Deen was dismissed, and Egleston was not advised to see the patient first, the negligence would rest with Dorsey or Jones (and perhaps Kidney), not Egleston. Dkt. No. 72, Ex. 6, Dorsey Dep. 41-

16

43; Dkt. No. 72, Ex. 7, Kidney Dep. 15.

In addition, Plaintiffs have not presented any evidence that Defendant intentionally concealed or misrepresented any facts with respect to the particular allegations at issue in this portion of the Deens' complaint. There is insufficient evidence to support a claim for constructive fraud.

## IV. Medical Malpractice Claim

### A. Plaintiffs' Constitutional Arguments Were Not Waived

Defendant urges the Court to decline to consider the constitutional arguments in this case, based on a representation made by Plaintiffs' counsel at oral argument on Defendant's motion to dismiss. Plaintiffs' counsel, perhaps believing that he was tilting at windmills, announced that he would waive Plaintiffs' constitutional arguments relating to Georgia's medical malpractice statute of limitations. Dkt. No. 52 at 4; Miguel de Cervantes, Don Quixote (1604).

Later during argument, the Deens' attorney indicated that he did not intend to waive their equal protection arguments at all. Plaintiffs' attorney stated that the statute at issue was fundamentally unfair, and attempted to

AO 72A
(Rev. 8/82)

distinguish the leading Georgia Supreme Court case on the topic, <u>Kumar v. Hall</u> (decided on equal protection grounds), via visual aids and exhibits. 262 Ga. 639 (1992).

Additionally, Plaintiffs noted in subsequent briefing that they incorporated their equal protection arguments submitted in an earlier brief by reference. Dkt. No. 53 at 13; Dkt. No. 72-1 at 7-8. The constitutional arguments have been briefed by the parties, and are relied on by Plaintiffs as the only substantial ground in opposition to Egleston's attempt to obtain summary judgment on, or dismissal of, the medical malpractice claims.[3] Because it is clear that Plaintiffs did not intend to waive their constitutional arguments, the Court will consider them.

## B. <u>Plaintiffs' Allegations and the Relevant Statutory Background</u>

The Deens contend that Egleston committed professional negligence in the following ways:

---

[3] The insubstantial grounds relied on by Plaintiffs, the "new injury" and "physical disability" exceptions, do not warrant extended treatment. It suffices to say that (1) Deen did not suffer any "new injury" in the two years before the instant case was filed, and (2) there is no <u>independent</u> common law tolling principle under Georgia law for physical disability, separate and apart from mental disability, to allow the Deens to elude the statute of limitations based on Mr. Deen's physical limitations alone. <u>See</u> <u>Amu v. Barnes</u>, 283 Ga. 549, 551-53 (2008); <u>Anglin v. Harris</u>, 244 Ga. App. 140, 142-44 (2000).

AO 72A
(Rev. 8/82)

(a) By failing to refer Kenneth Deen to an oral surgeon for antibiotic treatment and extraction of tooth number 9 in which Mr. Deen had serious peri[o]dontal disease and significant bone loss;

(b) By beginning periodontal treatment in an effort to retain tooth number 9 and use it for a bridge; and

(c) By performing a deep scaling procedure on August 4, 2005 without beginning antibiotic treatment in that[,] due to the very poor condition of the tooth and gum, this would have caused huge amounts of bacteria to have been dumped into the blood stream.

Dkt. No. 47, ¶ 33.

Plaintiffs state that Mr. Deen's disability could have been avoided if Defendant had performed her supervisory function and not allowed the debridement to take place, or the harm could have been abated if Egleston had prescribed antibiotics to combat the presence of the additional bacteria in the bloodstream created by the debridement.

Under Georgia law, the applicable medical malpractice statute of limitations is two years after the date on which the injury occurred. Ga. Code Ann. § 9-3-71(a). It is undisputed that the averred malpractice occurred either on July 18, 2005, or on August 4, 2005. Egleston submits that, because the complaint was not filed until more than two years later, on March 21, 2008, the statute of limitations has run as to any medical malpractice claims.

19

Under Georgia's general statute of limitations rules, "[m]inors and persons who are legally incompetent because of mental retardation or mental illness, who are such when the cause of action accrues, shall be entitled to the same time after their disability is removed to bring an action as is prescribed for other persons." Ga. Code Ann. § 9-3-90(a).

Additionally, state law provides that

[i]f any person suffers a disability specified in Code Section 9-3-90 after his right of action has accrued and the disability is not voluntarily caused or undertaken by the person claiming the benefit thereof, the limitation applicable to his cause of action shall cease to operate during the continuance of the disability.

Ga. Code Ann. § 9-3-91.

Under governing precedent, these savings statutes prevent the statute of limitations from running against a person who is incapacitated because of their mental disability. See Lowe v. Pue, 150 Ga. App. 234, 234-35 (1979). Egleston notes that the state legislature has decreed that these general tolling provisions do not apply in cases of medical malpractice. Ga. Code Ann. §§ 9-3-71(a) & 9-3-73(b). An action arising out of the provision of dental services or diagnosis is a medical malpractice action. Ga. Code Ann. § 9-3-70.

20

AO 72A
(Rev. 8/82)

Georgia Code section 9-3-73(b) provides, in pertinent part, that: "Notwithstanding [sections 9-3-90 & 9-3-91], all persons who are legally incompetent because of mental retardation or mental illness and all minors who have attained the age of five years shall be subject to the periods of limitation for actions for medical malpractice provided in this article [sections 9-3-70 through 9-3-74]."

Because Deen was incapacitated by Egleston's alleged negligence, Plaintiffs argue that the non-tolling provision of section 9-3-73(b) should not apply. That is, the Deens assert that Mr. Deen is neither "mentally ill" nor "mentally retarded" under the law. Egleston's rejoinder is that, in a four-three decision, the Georgia Supreme Court rejected such an argument, and found that the medical malpractice statute of limitations was not constitutionally infirm on equal protection grounds as to mental incompetents, whose incompetency was allegedly brought about by the defendant's negligence. Kumar v. Hall, 262 Ga. 639, 642-43 (1992)(reading "mentally ill" and "mentally retarded" broadly, consistent with Lowe). As far as Defendant is concerned, that ought to settle the matter.

As Plaintiffs note, Kumar could be distinguished on its facts. The Kumar court noted that the plaintiff "had a legal

21

guardian to act on his behalf, and that his guardian retained counsel specifically to investigate the possibility of bringing a malpractice suit." Kumar, 262 Ga. at 644. The court noted that there was no suggestion that the guardian or her attorney "were in any respect unable to properly evaluate [the] malpractice claim and file it before the limitations ran," so there was no constitutional deprivation. Id.

In contrast, Mr. Deen was not represented by a conservator during the two years after he was incapacitated. On May 7, 2008, Linda Deen was appointed as her husband's conservator. Before that date, Deen did not have a guardian or conservator safeguarding his interests. Plaintiffs assert that Linda Deen was unable to determine that Egleston was responsible for her husband's injuries before discovery commenced, in late 2007, in related medical malpractice cases against other health care professionals involved in Mr. Deen's care.

As the Deens note, the Georgia Supreme Court might decide this case differently than Kumar, given these distinguishing facts. Yet, this is not crucial to the Court's decision today, and the Court does not speculate how the Deens' case would turn out before the state supreme

22

court.[4]  Egleston is correct that the Court is bound by the Georgia courts' interpretations of their own state statutes. But because the Deens attack the statute on federal equal protection grounds, the Court need not defer to Kumar's constitutional conclusion.  The Court turns to the constitutional question now.

### C. Georgia's Non-tolling Provision Violates the Equal Protection Clause of the Fourteenth Amendment

The Deens argue that Georgia Code section 9-3-73(b) is unconstitutional, in that it treats mentally incompetent individuals differently when they have medical malpractice claims, as opposed to other causes of action.

In a seminal opinion, the New Hampshire Supreme Court rejected a similar legislative attempt to bar medical malpractice claims by incapacitated adults, but not other

[4] Plaintiffs' case may be much closer to Kumar than they would like to acknowledge.  Dkt. No. 72, Ex. 8, Linda Deen Aff. ¶ 4.  There is evidence that Mrs. Deen had notice within a month of Mr. Deen's hospitalization that could have allowed her to identify Plaintiffs' claims against Egleston.  Mrs. Deen testified that, on September 13, 2005, Dr. Capes, a local dentist, extracted tooth number nine, and told Linda Deen that "he felt that was where the [brain] infection was coming from."  Dkt. No. 72, Ex. 1, Linda Deen Dep. 90 (Nov. 1, 2007).  Further, Linda Deen testified that she knew that her husband sought treatment for the tooth from Gentle Dental's office in July and August of 2005.  Dkt. No. 72, Ex. 2, Linda Deen Dep. 15-27 (Aug. 12, 2008).  Nonetheless, the Court's conclusions herein rest not on the notice to Linda Deen, but rather on the lack of notice to Kenneth Deen.  As the Court perceives it, the true constitutional difficulty is in holding an incapacitated adult responsible for a next friend's negligence.

23

causes of action by the mentally incompetent:

> The legislature may not, consistent with equal
> protection principles, deny only this class of
> medical malpractice plaintiffs the protection
> afforded all other persons by the saving
> statute. . . . In doing so, [the statute] does
> not substantially further the legislative object
> of containing the costs of the medical injury
> reparations system because the number of
> malpractice claims brought by or on behalf of
> minors or mental incompetents is comparatively
> small. . . . At the same time, the statute
> operates to extinguish a cause of action of which
> the plaintiff, due to his disability, may not
> have learned until after the limitations period
> has expired.

Carson v. Maurer, 424 A.2d 825, 833-34 (N.H. 1980)(abrogated

in part on other grounds, Cmty. Res. for Justice, Inc. v.

City of Manchester, 917 A.2d 707, 719-21 (2007)); see also

Whitlow v. Bd. of Educ. of Kanawha County, 438 S.E.2d 15, 20-

21 (W. Va. 1993)(applying rational basis review to strike

down similar legislation, noting that most courts confronted

with similar statutory schemes have found that they violate

equal protection principles).

Likewise, the Illinois Supreme Court has stated that

"incompetents are favored persons in the eyes of the law and

courts have a special duty to protect their rights." Bruso

ex rel. Bruso v. Alexian Bros. Hosp., 687 N.E.2d 1014, 1017

(Ill. 1997). The Bruso court recognized that "[t]he purpose

of tolling provisions for legal disability . . . is to

24

protect the rights of those who are not competent to do so themselves. These provisions recognize that the enforcement of an incompetent person's rights should not be 'left to the whim or mercy of some self-constituted next friend.'" <u>Id.</u> (<u>quoting</u> <u>Passmore v. Walther Mem'l Hosp.</u>, 504 N.E.2d 778, 781 (1987)).

Notwithstanding varying state court decisions applying heightened scrutiny under their own state constitutions in similar cases, governing federal precedent indicates that rational basis review, albeit in a robust form, applies to the challenged Georgia law. The Court must consider whether the statutory distinction is rationally related to a legitimate government objective.[5]  <u>City of Cleburne v.</u>

---

[5]

We have stressed that this standard of review is typically quite deferential; legislative classifications are "presumed to be valid," <u>Massachusetts Bd. of Retirement v. Murgia</u>, 427 U.S. 307, 314 (1976), largely for the reason that "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." See <u>Dandridge v. Williams</u>, 397 U.S. 471, 485 (1970).

<u>Lyng v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am.</u>, 485 U.S. 360, 370 (1988).

The Equal Protection Clause . . . does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.  A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

Cleburne Living Ctr., Inc., 473 U.S. 432, 439-40 (1985).

In Cleburne, the respondent planned to open a group home for thirteen retarded adults. The residents would be supervised by staff members. The petitioner city had a zoning ordinance that required the respondent to obtain a special use permit to operate such a home. Id. at 435.

The City of Cleburne required such a permit for "the construction of '[hospitals] for the insane or feeble-minded, or alcoholic [sic] or drug addicts, or penal or correctional institutions.'" Id. at 436. However, hospitals, apartment buildings, fraternal organizations, and fraternity houses could be built and operated in that area of town without obtaining any special permission. Id. at 436 n.3. The city refused to grant a permit for the group home, and the respondent filed suit.

The Fifth Circuit determined that mental retardation was a "quasi suspect" classification, and held that the ordinance violated the equal protection clause. Id. at 437-38. The Supreme Court determined that mental retardation was not a quasi-suspect category, subject to heightened scrutiny. Still, the Supreme Court agreed that the ordinance was

Reed v. Reed, 404 U.S. 71, 75-76 (1971) (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)).

AO 72A
(Rev. 8/82)

unlawful, striking it down under the rational basis test.

In finding the ordinance unconstitutional, <u>Cleburne</u> showed special solicitude toward the rights of mentally retarded individuals. The Supreme Court has noted that the rational basis test is "not a toothless one," <u>Schweiker v. Wilson</u>, 450 U.S. 221, 234 (1981), and demonstrated in <u>Cleburne</u> that the courts should undertake a robust, searching form of rational basis review where the challenged law discriminates against the mentally incapacitated. <u>See also</u> <u>Plyer v. Doe</u>, 457 U.S. 202, 230 (1982); <u>Romer v. Evans</u>, 517 U.S. 620, 631-35 (1996).

"The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." <u>City of Cleburne</u>, 473 U.S. at 446. "Doubtless, there have been and there will continue to be instances of discrimination against the retarded that are in fact invidious, and that are properly subject to judicial correction under constitutional norms." <u>Id.</u>

The <u>Cleburne</u> Court asked whether the record revealed "any rational basis for believing that the [group retarded] home would pose any special threat to the city's legitimate interests." <u>Id.</u> at 448. The Court rejected the

reasonableness of the city's stated reasons for denying the permit, including the negative attitudes of neighboring residents, the risk that nearby junior high students might harass the residents, a concern over legal liability for the conduct of the residents, and increased traffic. Instead of accepting these justifications at face value, the *Cleburne* Court found that the proposed group home posed no "different or special hazard[,]" when compared with any other allowable use, like a hospital or apartment building. *Id.* at 449.

To withstand rational basis review, legislation that discriminates against the mentally incapacitated must be rationally related to a legitimate government purpose. *Cleburne* remains good law, and the Court is obliged to apply it to the instant case, inasmuch as the Georgia's classification is not fairly distinguishable from the Texas municipal ordinance struck down in that decision. The Court will judge the statute using *Cleburne*'s robust, searching version of the rational basis test.

When the Court applies the "rational basis with bite" standard, it "focuses on the legislative means used to achieve the ends. This standard simply requires the court to conduct an inquiry to determine whether the legislation has more than a speculative tendency as the means for

28

furthering a valid legislative purpose." <u>Ferdon v. Wis.</u>
<u>Patients Comp. Fund</u>, 701 N.W.2d 440, 460 (Wis. 2005).

Helpfully, the state legislature's purpose for enacting
the medical malpractice reform legislation has been set out
in statutory form:

> The findings of the General Assembly under this
> Code section include, without limitation, that a
> reasonable relationship exists between the
> provisions, goals, and classifications of this
> Code section and the rational, legitimate state
> objectives of providing quality health care,
> assuring the availability of physicians,
> preventing the curtailment of medical services,
> stabilizing insurance and medical costs,
> preventing stale medical malpractice claims, and
> providing for the public safety, health, and
> welfare as a whole.

Ga. Code Ann. § 9-3-73(f).

Ensuring access to affordable healthcare is a legitimate
legislative objective, but that aim is not reasonably
furthered by discriminating against incapacitated adults'
medical malpractice claims.

"A statute may be constitutionally valid when enacted
but may become constitutionally invalid because of changes
in the conditions to which the statute applies. A past
crisis does not forever render a law valid." <u>Ferdon</u>, 701
N.W.2d at 468.

Experience and experimentation in the states has shown

AO 72A
(Rev. 8/82)

that medical malpractice lawsuits are not a major driver of skyrocketing healthcare costs. The Court doubts whether medical malpractice lawsuits were ever a real part of the healthcare problem, with respect to rising costs, in this country. The impetus behind the special legislation for medical malpractice cases appears to have been based on either misunderstanding of the problem of healthcare expenses, or an outright boondoggle. Although medical malpractice suits have been stifled, healthcare costs continue to soar. If malpractice lawsuits were a problem in limiting affordable, quality healthcare at one time, the facts no longer support the idea that lawsuits remain part of the problem. Study after study shows malpractice costs as averaging around one percent of healthcare costs, but expenses continue to rise at an alarming rate. Ferdon, 701 N.W.2d at 484 n.218; Tom Baker, The Medical Malpractice Myth (2005).

"The facts are few but telling. The statute has been in effect nine years. So far as the record shows, malpractice premiums have not declined and health care costs have increased to the crisis point." Kenyon v. Hammer, 688 P.2d 961, 976-77 (Ariz. 1984); id. at 978 (citing statistics indicating that "the 'long tail' caused by the discovery rule

30

is not a significant portion of the problem."); [6] see also Whitnell v. Silverman, 646 So. 2d 989, 993-95 (La. Ct. App. 1995) (rev'd, limited by, Whitnell v. Silverman, 686 So. 2d 23, 26-30 (La. 1996)); Edward J. Kionka, Things to Do (or not) to Address the Medical Malpractice Insurance Problem, 26 N. Ill. U. L. Rev. 469, 470-74 (2006); Michael D. Green, The Paradox of Statutes of Limitations in Toxic Substances Litigation, 76 Cal. L. Rev. 965, 1009-10 (1988) (rejecting the insurance industry's "long tail" argument based on asbestos defendants' conduct in response to premature claims).

As other courts have found, the legislature was either "misinformed or subsequent events have changed the situation substantially." Arneson v. Olson, 270 N.W.2d 125, 136 (N.D. 1978). Meanwhile, the harm to the Plaintiff is substantial. Georgia Code section 9-3-73 "unconstitutionally locks the courtroom door before the injured party has had an opportunity to open it." Hardy v. VerMeulen, 512 N.E.2d 626,

---

[6] Long tail liability describes a concern by the insurance industry regarding the accurate calculation of losses in any given premium year. The argument is that tolling the limitations period artificially raises premiums because of the uncertainty of unresolved claims. Thomas L. Stachler, Repose v. Right-to-a-Remedy: Physician vs. Patient Under the Ohio Constitution, 57 U. Cin. L. Rev. 423, 426-27 (1988). Doctors, insurers, and associated business interests used these concerns to convince state legislatures across the country to enact laws limiting tolling and the statute of limitations in medical malpractice cases in the 1970s and 1980s.

AO 72A
(Rev. 8/82)

628 (Ohio 1987). A main reason for a statute of limitations, preventing unwarranted delay in the presentation of claims, is absent where the plaintiff is incapacitated, and unable to assert his claim as a result of defendant's averred negligence.

Thus, there is not a rational relationship between the purported state interest of providing affordable, quality healthcare and the non-tolling provision for mental incompetents. Malpractice costs make up about one percent of healthcare costs, and claims brought by incapacitated persons beyond the limitations period make up an extremely small proportion of all malpractice claims. The state law limitation is thus arbitrary, and unconstitutional.

In a recent, thoughtful opinion striking down Georgia's cap on non-economic damages in medical malpractice cases, Fulton County State Court Judge Diane E. Bessen reached a similar conclusion. <u>Nestlehutt v. Atlanta Oculoplastic Surgery, P.C.</u>, No. 2007EV002223-J, slip op. at 17-19 (Feb. 9, 2009)(holding that the state law violated equal protection principles), <u>available at</u> http://www.dailyreportonline.com. "Most obviously, it is a complete contradiction to state that the overall quality of healthcare would be improved by <u>shielding</u> negligent health care providers from liability."

AO 72A
(Rev. 8/82)

Id. at 17.

Even if the Court were to assume that the state had a legitimate interest in limiting medical malpractice liability, the Court would still conclude that the statute does not pass a robust form of rational basis review. As in Cleburne, the record does not reveal that claims advanced by mental incompetents pose any special or different threat to limiting medical liability, not shared by the exceptions carved out in estate, contribution, and foreign object cases under Georgia law.

Georgia's medical malpractice statute "discriminates internally among the various types of claims against licensed health care providers." Kenyon v. Hammer, 688 P.2d 961, 969 (Ariz. 1984); Austin v. Litvak, 682 P.2d 41, 48-53 (Colo. 1984)(rejecting a similar state law, applying rational basis review); but see Allrid v. Emory Univ., 249 Ga. 35, 38 (1982).

> We are aware of the very respectable authority to the effect that a statute . . . which says the discovery rule applies to cases in which a foreign object is left in a patient's body but not to other medical injury allegations is unconstitutional because it is a denial of equal protection of the laws.

Treat v. Kreutzer, 720 S.W.2d 716, 718 (Ark. 1986).

Georgia law contains a special provision for medical

33

malpractice cases involving foreign objects found in patients' bodies after surgery: "The limitations of Code Section 9-3-71 shall not apply where a foreign object has been left in a patient's body, but in such a case an action shall be brought within one year after the negligent or wrongful act or omission is discovered." Ga. Code Ann. § 9-3-72; see also Ga. Code Ann. § 9-3-73(e).

That an exception is provided by the legislature for victims of medical malpractice who later find a foreign object in their body, but not for one who suffers total incapacity as a result of the defendant's negligence, is not rationally related to any legitimate government aim of limiting medical liability. There is nothing different or special about foreign object cases that justifies applying a discovery rule to their claims but not mental incompetents' claims.

> On a theoretical basis it is impossible to justify the applicability of the discovery rule to one kind of malpractice and not to another. The reason for the application of the discovery rule is the same in each instance. It is manifestly unrealistic and unfair to bar a negligently injured party's cause of action before he has had an opportunity to discover that it exists. This is true whether the malpractice consists of leaving a foreign object in the body or whether it consists of faulty diagnosis or treatment.

AO 72A
(Rev. 8/82)

Frohs v. Greene, 452 P.2d 564, 565 (Or. 1969).

Also, as Plaintiffs point out, the statutory scheme does not purport to limit contribution claims held by medical malpractice defendants to the two year statute of limitations of section 9-3-71. In complicated cases like this one, malpractice defendants would have the right to bring contribution claims against those involved in the care of the incapacitated adult while an incapacitated plaintiff would possess the more limited remedies provided in section 9-3-71. The distinction under Georgia law between the claims of injured patients and defendants' contribution claims is not rationally related to the goal of limiting medical malpractice liability.

Further, there is no rational basis for the distinction between estate claims and personal injury claims arising from medical malpractice. Georgia law provides that the statute of limitations is tolled from the time of an individual's death until an executor or administrator is appointed, so long as the case is brought within five years. Ga. Code Ann. §§ 9-3-92 & 9-3-98; Goodman v. Satilla Health Servs., 290 Ga. App. 6, 6-7 (2008).

A living person and an estate would claim damages for the same injuries, e.g., medical expenses necessitated by the

35

tort and the injured's pain and suffering. In addition, the estate would possess an additional claim for funeral expenses. Such a distinction between the living and the dead is not rationally related to limiting health care costs, or medical malpractice liability.

In addition, the certainty sought by the legislature is not defeated by hearing Deen's claim on the merits, because the five year statute of repose provides an outer limit on liability. Ga. Code Ann. § 9-3-73(c).

In sum, whether the legitimate state end is considered to be quality, affordable healthcare, or limiting medical malpractice liability, the means chosen by the legislature are not rationally related to achieve those ends. Instead, it appears that the distinction challenged here rests on an "irrational prejudice" against the mentally incompetent. City of Cleburne, 473 U.S. at 450.

As Egleston has emphasized, prescribing statutes "of limitation is a legislative, not a judicial function[,]" and the intent of the legislature is clear in this instance. Young v. Williams, 274 Ga. 845, 848 (2002). Nonetheless, the Court must fulfill its duties to interpret the law without fear or favor. "Should [the legislature], in the execution of its powers, adopt measures which are prohibited by the

36

constitution . . . it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land." McCulloch v. Maryland, 17 U.S. 316, 423 (1819).

The Court finds the state law invalid under the federal constitution. The statute discriminates against incapacitated adults whose incapacity was allegedly caused by the tortfeasor in medical malpractice cases, but not in other causes of action. The statutory scheme further discriminates internally against various types of claimants, favoring foreign object cases, estate claims, and medical malpractice defendants' contribution claims, but disfavoring claims held by minors and incompetent adults. Such discrimination is not rationally related to any legitimate governmental objective. Because the statute does not pass rational basis review, as applied to Kenneth Deen, it violates the equal protection clause of the Fourteenth Amendment.

The Court is of the opinion that this "order involves a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b). The Court further finds that an immediate appeal would advance the ultimate conclusion of this civil action. If Defendant

37

does file an appeal of this order pursuant to § 1292(b), all proceedings shall be stayed while the Eleventh Circuit considers the appeal.

## V. Loss of Consortium

Under Georgia law, a loss of consortium claim is a derivative action. <u>Grogan v. Bennett</u>, 208 Ga. App. 102, 103 (1992). Accordingly, the Georgia Supreme Court determined that the two-year statute of limitations for malpractice actions applied to loss of consortium claims due to malpractice. <u>Perry v. Atlanta Hosp. & Med. Ctr., Inc.</u>, 255 Ga. 431 (1986). However, because Kenneth Deen was incapacitated, and the state law limitations period cannot constitutionally be applied to bar his claim, his wife's derivative claim survives as well.

## CONCLUSION

For the reasons explained above, Egleston's motion for summary judgment is **GRANTED** in part, and **DENIED** in part. Dkt. No. 57. Defendant is entitled to judgment as a matter of law with respect to Plaintiffs' claims sounding in simple negligence, negligence <u>per se</u>, and constructive fraud, but

38

not as to the claims for professional negligence or loss of consortium.

Because the Court has considered the legal issues raised in Egleston's motions to dismiss in ruling on the summary judgment motion, Egleston's motions to dismiss are **DISMISSED** as moot. Dkt. Nos. 10 & 48. Defendant's motion to strike or exclude the depositions offered by Plaintiffs in opposition to her motion for summary judgment is **DENIED.** Dkt. No. 79.

The Clerk is directed to correct the caption of the case to read "Shannon Egleston, D.M.D., Defendant" as the proper party name of Defendant. Dkt. No. 83 at 4.

**SO ORDERED,** this __13th__ day of February, 2009.

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)